IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA        :

    v.                                                  :    Crim. No. 20-308-1

ROMEL BOLGER                          :

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR RELEASE**

Defendant Romel Bolger asks this Court to reconsider his detention pending trial in light of the COVID-19 pandemic. The government suggests that, because he does not present a circumstance which warrants his release, the motion should be denied. Further, the government opposes his release because, in this post-indictment and pre-trial phase of his case, he continues to present a danger to the community and a risk of flight. Pursuant to 18 U.S.C. § 3142(e)(3)(A), there is a presumption in this case that the defendant should be detained, and the defendant has failed, for a second time, to rebut that presumption.

    **I.     FACTUAL AND PROCEDURAL BACKGROUND**

In August of this year, a confidential source ("CS") working for the Drug Enforcement Administration ("DEA") introduced Bolger to an undercover Pennsylvania State Police Trooper ("UC") so that Bolger could purchase twenty kilograms of cocaine from the UC. Leading up to the purported drug deal, Bolger engaged in several recorded telephone conversations with the UC over several

days, and he ventured to the Springfield Mall in Delaware County to meet the UC in person and discuss the terms of the transaction. On August 19, 2020, after the UC and Bolger agreed that the UC would sell Bolger 20 kilograms of cocaine in exchange for $700,000, the defendant drove in tandem with his co-defendant, Kasib Parham, to meet the UC at a gas station in Delaware County. The deal would ultimately take place inside of a hotel room at the Red Roof Inn in Delaware County. After meeting the UC at the gas station and determining that the parties were ready to conduct the transaction, the defendant stated that he wanted to see the hotel room. The UC (now accompanied by a second UC ("UC-2")), Bolger, and Parham, all drove to the Red Roof Inn in separate vehicles. Bolger wanted to inspect a kilogram of cocaine prior to conducting the exchange, and the UCs obliged. As depicted in a clear video captured by law enforcement, Bolger entered the UC's car, without a mask on his face, and sat in the front passenger seat while the UC occupied the driver's seat and UC-2 occupied the back seat. Bolger, again ignoring all advice from the CDC, shook the hand of UC-2. UC-2 provided Bolger with a knife and a kilogram of cocaine so that Bolger could inspect the cocaine prior to purchasing it. In the same clear video, Bolger cut open the cocaine, smelled it, felt it, and expressed his satisfaction with it. He emphasized the need to be careful about the transaction because he had not done business with the UCs before (meaning, the need to be mindful of law enforcement). Bolger then got out of the UC's car. He motioned for Parham to exit Parham's car, indicating that the transaction would go through. Both Parham

and Bolger carried a duffel bag full of cash, which totaled $700,000, to purchase the cocaine. Parham and Bolger were about to enter a hotel room at the Red Roof Inn with the UC and UC-2 to conduct the transaction, but they were arrested prior to entering. In addition to the $700,000 contained in the two duffel bags, Parham had a bag containing various items of drug trafficking paraphernalia, and Bolger had an additional $10,440 in cash on his person. Search warrants were executed at each of their respective residences; at Bolger's residence, law enforcement recovered $181,073 in cash. Approximately $46,000 of that money was in a box addressed to Parham at 1210 Chestnut Street in Philadelphia. A search of Parham's Chestnut Street residence revealed additional cash, a money counter, and various items of drug trafficking paraphernalia with white residue, later determined by the DEA laboratory to contain cocaine base ("crack").

Bolger and Parham were immediately charged by complaint on August 20, 2020. The government filed a motion for detention, and Bolger's counsel filed a motion for his release. In Bolger's motion, and at the subsequent hearing on September 4, 2020, Bolger's medical conditions were made known to the Court. United States Magistrate Judge Richard A. Lloret, fully apprised of the defendant's medical conditions and the threat of COVID-19, ordered that the defendant be detained pending trial.[1] Judge Lloret held that no condition of release, or combination of conditions, would reasonably assure the safety of any

---

[1] ECF Doc. Nos. 6, 11.

person and the community or reasonably assure the appearance of the defendant as required. [2] Bolger has been detained at the FDC since his arrest on August 19, 2020.

## II.     DEFENDANT'S CRIMINAL HISTORY AND HIS EXPOSURE IN THIS CASE

The defendant faces a maximum penalty of life imprisonment, and a mandatory minimum term of 15 years' incarceration because he has a prior drug trafficking conviction for which he served over a year in prison and for which he was released within fifteen years of committing the instant offense. Pursuant to section 5G1.2(a) of the U.S. Sentencing Guidelines, the statutory mandatory minimum sentence becomes the guideline sentence. As such, the government estimates the guideline sentence to be 180 months, which is the statutory mandatory minimum. Notably, the defendant's prior conviction occurred in this district. Following the defendant's conviction at trial in 2008 for drug trafficking offenses, the Honorable Timothy J. Savage sentenced Bolger to 110 months in prison, followed by a five-year term of supervised release, among other conditions.[3]

The facts of Bolger's 2008 case are disturbing: his charges arose following a violent shoot-out in a residential neighborhood, and Bolger was shot. At the time of the shoot-out, Bolger was with an accomplice and that accomplice's young

---

[2] *Id.*

[3] Docket No. 07-cr-00388-TJS-2, ECF Doc. No. 163.

son outside of the accomplice's home. Inside of the house, law enforcement seized 61 kilograms of cocaine, 131 grams of crack cocaine, $176,365 of U.S. currency, various items of drug trafficking paraphernalia, three firearms, and marijuana. In addition, outside the back of the residence where the shoot-out occurred, another firearm was recovered.[4]

It bears noting that following his prison sentence for the 2008 conviction, Bolger participated in this district's Reentry Court, successfully completed it, and received a 12-month reduction on his term of supervised release, which was originally scheduled to terminate on January 1, 2020. With that reduction, Bolger's supervised release was terminated early on January 1, 2019.[5] This history demonstrates that even the most intense Court supervision and resources afforded by the criminal justice system cannot deter Bolger's large-scale drug trafficking business or curb the significant danger that he poses to the community.

As this Court is aware, our district's Reentry Court is led by federal judges Timothy R. Rice and L. Felipe Restrepo, and staffed by U.S. Probation and every single stakeholder in the criminal justice system. The goal of the court is to help ensure defendants become more productive citizens of the community and to reduce the rate of recidivism by providing them with a highly structured support

---

[4] Docket No. 07-cr-00388-TJS-2, ECF Doc. No. 144.

[5] *Id.*, ECF Doc. Nos. 242, 243.

system. In return for successfully completing the program, those defendants receive a recommendation for a reduced term of supervised release. Here, the defendant received that benefit, but he failed to fulfill his end of the bargain: Within just 20 months of being released from supervision, he repaid the Court's generosity by attempting to conduct a massive, $700,000 drug deal that, if successful, would have flooded this region with tens of thousands of grams of illicit cocaine.

In addition to the above-mentioned federal conviction, he was convicted in Philadelphia County in 2004 of possession of a controlled substance, and was sentenced to a term of probation. He was also adjudicated as a juvenile for simple assault.

### III. DEFENDANT DOES NOT PRESENT A CIRCUMSTANCE JUSTIFYING HIS RELEASE AND HE IS STILL A DANGER TO THE COMMUNITY AND PRESENTS A CONTINUED RISK OF FLIGHT IF RELEASED

Bolger now seeks this Court's reconsideration of Judge Lloret's detention order. On November 30, 2020, Bolger filed the instant motion for pretrial release. Notably, Bolger does not point to any realistic change in circumstances to suggest that he no longer poses a threat to public safety or risk of flight. Instead, Bolger's motion reiterates the same health concerns presented to Judge Lloret at his detention hearing, and is predicated solely upon a concern that he might become infected with COVID-19 and become severely ill. To be clear, he committed the instant offense while this pandemic was raging—he met with

strangers, travelled all around town, did not wear a face covering, and entered confined spaces with others to effectuate the drug deal for which he is charged. As stated above, he is housed at FDC Philadelphia. His most recent medical record from November 18, 2020, indicates that he has tested negative for COVID-19, is asymptomatic, and is in quarantine.

BOP had a Pandemic Influenza Plan in place since 2012, and developed it further beginning in January 2020, in consultation with the CDC and World Health Organization, upon the emergence of the COVID-19 threat. BOP implemented that plan on March 13, 2020, applying exceptional changes to its operations in order to prevent and mitigate the spread of COVID-19. In part, BOP significantly restricted the intake and movement of inmates; it reduced the movement and congregating of inmates within institutions by confining inmates to their cells for longer periods; it severely restricted visits by non-BOP staff members to institutions; and it distributed face masks and cleaning supplies to all staff and inmates.

For over seven months, these and other steps were remarkably successful in preventing the spread of the virus within FDC Philadelphia, even as tens of thousands of people were infected in the surrounding city. Until late October, there was no known instance of COVID-19 in the general inmate population. One method developed by BOP to protect inmate populations – the screening of arriving inmates – proved particularly successful. BOP developed a plan in which every newly arriving inmate is tested for COVID-19, then placed in quarantine for

14 days regardless of the result, then tested again and not released to the general population until a negative test is returned. A handful of positive cases were detected at the FDC using this method through the months.

Then, on October 30, the FDC received a positive test result revealing that the virus had finally entered the prison population. An inmate who was scheduled for transfer to another institution had been tested on October 26, and that result came back positive. Through subsequent testing, it was learned that scores of inmates in that inmate's housing unit were also positive. FDC officials acted with alacrity, locking down the entire institution and thus quarantining all inmates to prevent further spread. BOP also tested the entire inmate population. In the end, it was determined that approximately 240 of the 1,000 inmates in the institution tested positive. Fortunately, most infected inmates remained asymptomatic throughout, no inmate exhibited significant illness, and no inmate required medical care outside the institution.

During the lockdown, all housing units were on quarantine status. Inmates were confined to their cells. On each housing unit, only two cells were released at a time. Specifically, each two-person cell was released for 30 minutes, three times a week, to shower and make phone calls. Inmates were provided with cleaning supplies for their cells and shower area. The FDC continued to provide all health services, meals, laundry, commissary, and other essential services in an orderly manner.

An inmate who tested positive was not housed with an inmate who tested negative or whose status was unknown.

The BOP, consistent with CDC guidelines, uses a clinical symptom-based model to determine when an inmate is deemed recovered and may be released from isolation status. Under the BOP clinical guidance, after a minimum isolation period of ten days, the timeline for release from isolation is based on a multifactor clinical analysis encompassing: 1) whether the inmate displayed symptoms; 2) the severity of the illness; and 3) whether the individual is severely immunocompromised.  All inmates who tested positive were reviewed under these guidelines before release from isolation status.

As for inmates who tested negative, such as Bolger, they remained in quarantine status until they were tested again, at least 14 days later, and returned another negative result.

Each housing unit is released from quarantine status only once every inmate in the unit is either deemed recovered after a positive test, or has produced two negative test results as explained above.

As of December 3, there remained 11 inmates in the institution in positive status, while 228 were deemed recovered, and all other inmates in the current population of 933 had tested negative at least once. Four of the institution's nine housing units had been released from quarantine, with operations resuming consistent with BOP's action plan for mitigating the spread of COVID-19.

Here, Bolger, through counsel, submits that he is at an elevated risk for complications if he contracts COVID-19 because, at the age of 39, he suffers from obesity, asthma, diabetes, sleep apnea, bronchitis, and hypertension. See Def. Mot. at 2. While the CDC has identified obesity, diabetes, and smoking as conditions that are known to put an individual at greater risk of severe illness upon contracting COVID-19, the CDC does not have sufficient data to conclude that there is a risk of severe illness for those with asthma and hypertension.[6] The defendant further complains of sleep apnea and bronchitis, but those conditions do not appear as potential or actual risk factors identified by the CDC.[7]

The government does not dispute that the defendant's obesity, smoking, and diabetes all put him at an increased risk of severe illness should he contract COVID-19. It is hoped that, as the current outbreak is being thwarted, BOP's efforts which proved successful for so many months in keeping the virus out of the institution will again protect the inmate population. We recognize, of course, that this is a pernicious virus that may reenter at any time, but it is also notable

---

[6] The defendant's FDC records indicate that at present he suffers from chronic bronchitis. These records also indicate that he is prescribed an inhaler to prevent or relieve an asthma attack, but that he should not use it daily. It is unclear from these records whether the defendant presently suffers from asthma, as it is not listed as a current ailment, though the defendant has asserted in his motion that he does presently suffer from this condition. His older medical records from 2015-2019 do list asthma, but there is no indication that it was uncontrolled.

[7] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed December 2, 2020)

that BOP during the past month proved itself capable of stemming an outbreak and limiting its spread within the FDC.

In the end, it is undeniable that there is a risk that the virus will return, and that Bolger is at greater risk were he to contract the disease. But it is also undeniable that Bolger continues to present a danger to the community and a risk of flight, and that when last at liberty in August, presenting the same conditions and facing the same risk of severe illness as a result of the pandemic, he eschewed any semblance of social distancing and self-protection in order to attempt to engage in drug trafficking on a huge scale.

Now that he is incarcerated for this conduct, he avers that his health conditions warrant his release. With his instant motion, Bolger has effectively averred that his conditions are too severe for him to remain incarcerated, but not severe enough to prevent him from effectuating his drug trafficking business in such a manner that ignores all CDC guidance and puts the community in grave danger. His 110-month sentence did not deter him from reentering the drug business, and the amount of money seized in this case (just shy of $900,000) strongly indicates that this is not his first drug deal since his release from prison in 2015.[8] Access to such large sums of illicit cash, combined with the significant 15-year mandatory minimum sentence the defendant faces, both increase the risk that he will flee.

---

[8] The defendant has been unemployed since 2018.

In responding to the instant motion, the government is mindful of this Court's recent decision in *United States v. Charles Salley*, 19-688-MAK at ECF No. 80, 81 (releasing defendant to home confinement upon third request despite danger defendant poses to community due to actual deteriorating health, hospitalizations, and testing positive for COVID-19) (Kearney, J.). But Salley presented very different circumstances. His alleged criminal conduct occurred in 2019, before the onset of the pandemic; he has not proven himself determined to engage in criminal activity and risk his health during the COVID-19 epidemic. And further, Salley's health has deteriorated further while in custody, as his body rejected a kidney transplant. All of those circumstances bear no resemblance to the present case. Bolger's condition, unlike Salley's, has not changed since he first entered the FDC. Bolger has not been hospitalized, and he is not suffering from anything that is not appropriately managed within the FDC. And according to the charges in this case, Bolger determinedly engaged in serious criminal conduct while the pandemic raged and he presented conditions (diabetes and obesity) that the CDC has recognized since the onset of the pandemic as placing individuals at greatest risk.

Ultimately, the defendant's criminal conduct during this pandemic, his very clear drug trafficking history, and his sentencing exposure in this case all demonstrate that he remains a significant flight risk and presents a danger to the community.  While his physical maladies are unfortunate, Bolger should not be

released while he remains in the same condition today as he did when he first entered the FDC.

## IV. CONCLUSION

The defendant has not overcome his burden to show that he is not a continued flight risk and danger to the community.  As Bolger does not present a circumstance warranting further action at this time, the government respectfully recommends that the motion for release be denied without a hearing.

Respectfully,

WILLIAM M. McSWAIN
United States Attorney


*/s Erica Kivitz*
ERICA KIVITZ
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified below through the Electronic Case Filing (ECF) system and/or electronic mail:

Robert Gamburg, Esq.
Robert@Gamburglaw.com

>  */s Erica Kivitz*
> ERICA KIVITZ
> Assistant United States Attorney

DATED:  December 4, 2020.